1  PAUL S. MEYER (State Bar No. 51146)
   PAUL S. MEYER, A PROFESSIONAL CORPORATION
2  695 Town Center Drive, Suite 875
   Costa Mesa, California 92626
3  Phone:   714 754 6500
   Fax:     714 979 9047
4  Email:   meyerlaw@fea.net

5  Attorney for Defendant
   CARLTON NEIL MORSE
6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,      )   CASE NO. SACR11-00170-AG
                                   )
12                  Plaintiff,     )   DEFENDANT'S SENTENCING
                                   )   MEMORANDUM
13        vs.                      )
                                   )   Date:   May 14, 2012
14  CARLTON NEIL MORSE,            )   Time:   1:30 p.m.
                                   )
15                  Defendant.     )
                                   )
16  ─────────────────────────────  )

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   A.   Facts Pertaining To Mr. Morse Personally . . . . . . . . . . . . . . . . . . . 4

      1.   Criminal History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      2.   Defendant's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      3.   Factors Leading to the Offense Conduct . . . . . . . . . . . . . . 5

      4.   Mr. Morse's Diary and Corrections to the PSR . . . . . . . . . . 6

   B.   The Offense Conduct And Corrections To The PSR . . . . . . . . . . . 7

   C.   Mr. Morse's Conduct After The Warrant . . . . . . . . . . . . . . . . . . . 9

III. ARGUMENT AND RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . 10

   A.   Corrections To The Presentence Report . . . . . . . . . . . . . . . . . . . . 10

   B.   Guideline And Departures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   C.   *Booker* Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      1.   The Nature and Circumstances of the Offense . . . . . . . . 13

      2.   The Defendant's Characteristics . . . . . . . . . . . . . . . . . . . 13

      3.   Collateral Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      4.   Suffering of Mr. Morse - Stigma of Felony Conviction,

          Sex Offender Registration . . . . . . . . . . . . . . . . . . . . . . . . 15

      5.   Acceptance of Responsibility . . . . . . . . . . . . . . . . . . . . . . . 16

      6.   Rehabilitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      7.   Mr. Morse's Vulnerability in Custody . . . . . . . . . . . . . . . . 17

      8.   Avoidance of Disparity in Sentencing . . . . . . . . . . . . . . . . 17

      9.   Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      10.  Educational, Vocational and Treatment Consideration . . . 19

DEFENDANT'S SENTENCING MEMORANDUM

D.   Recommendations .......................................  19

      1.   Prison Sentence  ...............................  19

      2.   Post-sentencing Rehabilitation .....................  19

      3.   Supervised Release Consideration ..................  19

      4.   Self-surrender ..................................  20

      5.   Residential Drug Abuse Program (RDAP)  ...........  20

DEFENDANT'S SENTENCING MEMORANDUM

1

# TABLE OF AUTHORITIES

2                                                                              **Page**

3 <u>**CASES**</u>

4 *Brady v. United States*

5        397 U.S. 742, 90 S.Ct. 1463 ................................... 16

6 *Gall v. United States*

7        552 U.S. 38 (2007) ......................................... 11

8 *Kimbrough v. United States*

9        128 S. Ct. 558 (2007) ...................................... 11

10 *Smith v. Wainwright*

11        664 F.2d 1194 (11th Cir. 1981) ............................. 16

12 *United States v. Ameline*

13        400 F.3d 646 (9th Cir. 2005) ............................ 12, 13

14 *United States v. Beiermann*

15        599 F. Supp.2d 1087 (N.D. Iowa 2009) ........................ 11

16 *United States v. Booker*

17        543 U.S. 220, 125 S. Ct. 738 (2005) ........................ 12, 13

18 *United States v. Calcagno*

19        Case No. 06-CR-00152-AHM ................................ 17

20 *United States v. Cherry*

21        487 F.3d 366 (6th Cir. 2007) ............................... 16

22 *United States v. Flyer*

23        633 F.3d 911 (9th Cir. 2011) ................................. 8

24 *United States v. Kline*

25        Case No. 02-CR-00040-CBM ................................ 17

26 *United States v. Kuchinski*

27        469 F.3d 853 (9th Cir. 2006) ................................. 8

28

DEFENDANT'S SENTENCING MEMORANDUM

**Page**

*United States v. Libby* sentence commutation

    http://georgewbush-

    whitehouse.archives.gov/news/releases/2007/07/20070702-3.html ... 15

*United States v. McBride*

    362 F.3d 360 (6th Cir. 2004) ................................. 11

*United States v. Monaco*

    23 F.3d 793 (3d Cir. 1994) .................................. 11

*United States v. Rausch*

    570 F.Supp.2d 1295 (D.Colo. 2008) ........................... 17

*United States v. Smith*

    683 F.2d 1236, 1240 (9th Cir. 1982) .......................... 15

*United States v. Stern*

    590 F.Supp.2d 945 (N.D. Ohio 2008) ...................... 16, 18

*United States v. Sudyka*

    2008 WL 1766765 (D.Neb. April 14, 2008) ..................... 11

*United States v. Shasky*

    939 F.Supp. 695 (D.Neb 1996) ............................... 17

**SENTENCING GUIDELINES**

U.S.S.G. Section 2B1.1 ......................................... 11

**STATUTES**

18 U.S.C. § 3553(a). ..................................... 12, 13

DEFENDANT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

Defendant Carlton Morse's sentencing is before the Court by way of a plea to the Court. There is no plea agreement in this matter. This memo will request a lower sentence than initially recommended by the March 26, 2012 Probation Letter to Court) (120 months), or later indicated in said letter "if the Court is inclined to apply a variance or departure"(48 months). *Id.* at p. 6.

There is no dispute that Mr. Morse possessed child pornography, or that the number of images exceeded 600. There *are*, however, factual nuances which distinguish this case and justify imposition of a far less harsh sentence indicated under either scenario envisaged by the Probation Office.

Outwardly a successful fourth-year associate with a nationally recognized law firm who had graduated from the USC School of Law in the top ten percent of his class, Mr. Morse was highly respected by the major partners in the firm. The son of very proud parents, he worked hard to maintain the high level of respect held by those he cared most about. Inwardly, however, Mr. Morse was secretly struggling with his sexual identity. Too fearful to disclose this struggle, he began drinking more heavily – and eventually, in an extraordinary lapse in judgment, turned to child pornography.

A personal diary kept by Mr. Morse, selected portions of which are set forth in the PSR, illustrate the extent of his struggles with child pornography -- which he repeatedly tried to dissociate from himself at that time. In his solitary losing struggle, he often discarded the "offending computer," first removing the internal hard drive before discarding the computer. He then threw the what had become an unusable hard drive into his closet, often first taking out his frustrations on it with a hammer. What makes this case even more unusual are the following further facts:

(a)    A government spreadsheet identifies the nine devices seized in this matter. <u>See</u> Exhibit 1. Of those, only two were functioning at the time of seizure. The remaining devices are internal hard drives, which had been removed from the computers when the computer body was discarded by Mr. Morse. These removed

1

1  hard drives were not connected to any computer, and many showed signed of damage.
2  The majority of the child pornography was found on these abandoned and unused
3  (and/or *unusable*) hard drives.

4      (b)     There is no question, and the defense admits, that Mr. Morse viewed
5  over 600 images. The government spreadsheet reveals, though, that the vast majority
6  (over four-fifths) of the images found on all the seized devices were located in areas
7  labeled as "Free Space," "Cache/Temp History," and "Recycle." *Id.* These images
8  were not in "Active" space, which represents child pornography immediately
9  available and viewable. The total of "active files" on all devices is 1,732; the total
10 of "active files" on the one useable device (Toshiba Laptop 1B17) is 518. These files
11 included some videos, which would move the image count above 600. "Free space,"
12 "cache" files, and "recycle" consist of such things as space on a hard drive containing
13 deleted data, the location where the computer will automatically store files which are
14 downloaded but not necessarily viewed, and the bin containing files that were not
15 necessarily or even likely viewed. "Free space" cannot be seen or accessed without
16 the use of forensic software, and "cache" files could be accessed via another program.
17 There is no evidence Mr. Morse ever possessed forensic software in this matter or
18 otherwise accessed "free space," nor that he ever saw anything in "cache" or would
19 know how to do so. Thus, while the total of "free space" files on all devices is 4,875,
20 the total of "cache" files on all devices is 6,578, and the total of "recycle" files on all
21 devices is 3,328, the child pornography actually seen by Mr. Morse is far less than the
22 numbers stated in the PSR.

23      (c)     A diary entry from "March 7, 2007" is actually a mis-written date entry,
24 plainly intended to be "2009": the entry is found in a bound volume between the
25 entries of February 2009 and April 2009. See Exhibit 2. Similarly, the date of
26 "January 4, 2008" is apparently another mis-written year, also apparently from 2009,
27 found in several loose pages between January 1, 2009 and January 25, 2009 (written
28 year is scribbled over). See Exhibit 3.

DEFENDANT'S SENTENCING MEMORANDUM

1        (d)    The child pornography in this matter came to Mr. Morse by way of his
2    participation in a Peer-to-Peer (P2P) file sharing program.

3        P2P permits sharing to occur by installing a P2P program. Thereafter, Mr.
4    Morse could download folders which contain images ("files"). No other action is
5    needed beyond this installation in order for others to have access, or "share," although
6    a user can also designate files for sharing. The participation of Mr. Morse in the
7    sharing aspect was completely passive. For his own use, however, Mr. Morse would
8    generally see a folder or file, and download it based on the name. Prior to download,
9    the actual images need not be viewed, nor is there necessarily an indication of the
10   actual number of images, or types of images, that will be coming in a folder. For
11   others to use the program, thereby accessing the files in Mr. Morse's program, Mr.
12   Morse did nothing apart from the installation of the program. Because of the
13   characteristics of the P2P program, it is possible for an individual to obtain thousands
14   or tens of thousands of images in folders which they never open, never see, and have
15   no knowledge regarding the actual contents. In this case, the government spreadsheet
16   sets forth what was contained on each device and where the files were located. See
17   Exhibit 1.

18       (e)    Mr. Morse's outward and inward worlds collided when the search
19   warrant was executed at his apartment on January 11, 2011. At this time, he
20   experienced a crisis of conscience, which now permits the Court to gain insight into
21   this young man. Amidst the expected arguments that his involvement with child
22   pornography displays an uncaring nature regarding the suffering of the child victims
23   tragically used to make the pornography, we ask the Court to consider whether he was
24   in fact simply bound up in his internal dilemmas and alcohol abuse and never
25   appreciated this aspect of his crime. In support of this perspective, we ask the Court
26   to consider Mr. Morse's conduct following the search warrant. He immediately
27   notified his supervising partner and the managing partner at the firm in order to
28   protect the integrity of the firm and its clients. He could easily have kept the

1   investigation and warrant hidden, collecting his paycheck and keeping his firm in the
2   dark.   The decision to voluntarily make this known to his firm at the outset
3   demonstrates that Mr. Morse is a caring person, who acts with integrity in times of
4   crisis. None of this mitigates the wrongfulness of his conduct regarding pornography,
5   but it provides insight into the person now before this Court for sentencing. A review
6   of the letters of the partners of the firm (including a former federal prosecutor, former
7   federal judge, and managing partner among others) corroborates this. See Exhibit 4.

8   (f)   Mr. Morse is now receiving the much needed counseling and treatment
9   for his addiction and identity issues. In September of 2011, he voluntarily enrolled
10  in and currently attends the Sex Offender Solution Program, directed by Dr. Wesley
11  Maram. This is not a simple monitoring program; rather, beginning on September 10,
12  2011, Mr. Morse began the evaluation, lab and treatment process in what can be a
13  multi-year program. See Exhibit 5. In conjunction with the sex offender treatment
14  program, Mr. Morse made full disclosure to his family, and his family is working in
15  full support of the program. Also, without court or pretrial orders, Mr. Morse has
16  continued attendance at Alcoholics Anonymous at least once per day and is actively
17  working the program with a sponsor.

18

19  **II.   STATEMENT OF FACTS**

20  Defendant Carlton Morse has entered a plea of guilty to one count of
21  possessing a laptop containing at least one image of child pornography in violation
22  of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2).   Relevant facts concerning Mr. Morse
23  personally and the offense conduct are set forth below.

24  **A.   Facts Pertaining To Mr. Morse Personally**

25  On pages 10 through 15, the presentence report ("PSR") sets forth Mr. Morse's
26  criminal history and various "offender characteristics." Highlights of those sections
27  are set forth below, along with additional information.
28  / / /

4

### 1.  Criminal History

Mr. Morse was never previously arrested or prosecuted before this case. PSR, p. 10, ¶¶ 38-44. Since his contact in this case, he has engaged in no other criminal conduct and suffered no arrests. PSR, p. 10, ¶¶ 42-44. The presentence report therefore accords him zero criminal history points. PSR, p. 10, ¶ 40.

### 2.  Defendant's Background

As both the presentence report and the Probation Office recommendation letter indicate, Mr. Morse was raised in a loving, religious household. Growing up in Tustin, Mr. Morse's father was a certified public accountant; his mother initially worked as a secretary, then enrolled in nursing school when Mr. Morse was in high school. PSR, pp. 10-11, ¶¶ 46, 48. Mr. Morse was involved in church activities as a child, was a member of the Boy Scouts, eventually was an Eagle Scout, and played the saxophone. PSR, p. 11, ¶ 49.

After graduation from college, Mr. Morse was admitted to USC Law School. He graduated in the top ten percent of his class, and was hired by Irell & Manella, a nationally prominent law firm. The presentence report states that the Probation Officer "was provided with numerous glowing letters from work associates, friends and family" – and his supervisors and colleagues "attest to Morse's dedication to work, reliability, integrity, intellect, and professionalism." PSR, p. 11, ¶ 51. In addition, "[h]is family members describe him as honest, generous, religious, patient, humble, and caring." *Id.*

### 3.  Factors Leading to the Offense Conduct

While outwardly very successful, Mr. Morse inwardly was secretly struggling with issues involving his sexual identity. The presentence report cites one letter from a former colleague and friend, to whom Mr. Morse had confided his attraction to adult men. PSR, p. 11, ¶ 52. The colleague and friend expressed the opinion that Mr. Morse had put "an enormous amount of pressure on himself to be what he considers perfect, essentially. Between his parents and his religious background, he very much

DEFENDANT'S SENTENCING MEMORANDUM

1  wants to do everything 'right': have a wife and kids, a great career, etc." *Id*. He
2  added that he believed that Mr. Morse's desire to excel ("wanting a perfect 'report
3  card'") had been "problematic for his personal life" – since it resulted in his doing
4  "everything in his power to deny, suppress, and ignore his attraction to men . . ." *Id*.

5       Mr. Morse did not disclose this painful struggle to his family, other friends, or
6  more senior colleagues at work. Instead, he forcefully attempted to mold himself to
7  fit the outward image that he believed was necessary to maintain the love of his
8  family and the respect of those in his working life. From law school onward, the
9  tension increased as the normal stress of competitive law school combined with the
10 psychological turmoil of his secret "problem." Seeking psychological help was out
11 of the question. Revelation of his secret, he believed, would cause him to lose
12 everything. Instead, as law school progressed, he turned increasingly to alcohol for
13 relief.

14      As noted in the Presentence Investigation Report, his drinking increased
15 throughout 2008 to reach a level of 1 - 1.5 bottles of wine per night in early 2009.
16 PSR, p. 13, ¶ 61. While the alcohol did not inhibit his academic or legal performance,
17 it left him vulnerable to lapses in judgment regarding his involvement with child
18 pornography. It appears that the viewing of child pornography was preceded by
19 alcohol abuse. An addictive personality, otherwise helpful to many litigators,
20 exacerbated the situation.

21           **4.    Mr. Morse's Diary and Corrections to the PSR**

22      As referenced in the presentence report, Mr. Morse kept entries in a diary. The
23 portions quoted in the PSR unquestionably give the Court insight into the intensity
24 of the Mr. Morse's struggles with child pornography. PSR, p. 5, ¶ 10. The defense
25 believes, however, that the presentence report is incorrect in stating that the journal
26 "dat[es] back to March 2007." *Id*. This clearly appears to be a mis-written date entry,
27 intended by Mr. Morse to be "2009." The entry is found in a bound volume between
28 the entries of February 2009 and April 2009. See Exhibit 2 (photographs of bound

1   diary pages taken in presence of agent). Similarly, the date of "January 4, 2008" (also
2   noted in the PSR, p. 5, ¶ 10) is apparently another mis-written year, found in several
3   loose pages between January 1, 2009 and January 25, 2009 (written year is scribbled
4   over). Again, this entry appears to be from 2009. See Exhibit 3.

5   **B.   The Offense Conduct And Corrections To The PSR**

6   When a search warrant was executed at Mr. Morse's residence on January 11,
7   2011, agents seized nine devices containing child pornography. According to the
8   presentence report, an extraordinarily high number of child pornography images and
9   videos were on those devices. This number is, however, misleading. In the first
10  place, only two of those devices were functioning, and one, the Blackberry, had no
11  images. In Mr. Morse's solitary losing struggle against what was becoming a
12  compulsion, he often discarded the "offending computer" -- first removing the
13  internal hard drive before discarding the computer. He would then throw the now
14  unusable hard drive into his closet, often first taking out his frustrations on it with a
15  hammer. The January 3, 2009 and January 22, 2009 diary references to smashing the
16  computers are found in the PSR at p. 5, ¶ 10.

17  Exhibit 1, the government spreadsheet, identifies the nine devices seized in this
18  matter. Of the seized devices, however, only number 1B17 (a Toshiba Laptop) and
19  1B15 (a Blackberry) were functioning at the time of seizure. The remaining devices
20  are internal hard drives, which had been removed from the computers when the
21  computer body was discarded by Mr. Morse. These removed hard drives were not
22  connected to any computer, and many showed signed of damage. The majority of the
23  child pornography was found on these abandoned and unused (or unusable) hard
24  drives. (Mr. Morse's active computer of Mr. Morse did, as the defense has
25  acknowledged, have over 600 images of child pornography.)

26  In the second place, the government spreadsheet also reveals that the vast
27  majority (over four-fifths) of the images were located in areas labeled as "Free
28  Space," "Cache/Temp History," and "Recycle" (see Exhibit 1):

7

1    (a) "Free space" (or unallocated space) is defined as space on a hard drive

2 that contains deleted data, usually emptied from the operating system's trash or

3 recycle bin, that cannot be seen or accessed by the user without the use of forensic

4 software. See *United States v. Flyer*, 633 F.3d 911, 918 (9th Cir. 2011). There is no

5 indication of any forensic software possessed by Mr. Morse in this matter, nor that

6 he accessed "free space" or unallocated space. The total of "free space" files on all

7 devices is 4,875. The total of "free space" files on the one active device is 4593.

8    (b) The total of "cache" files on all devices is 6,578. The total of "cache"

9 files on the one active device is 1808. "Cache" is a location which the computer will

10 automatically use to store files which are downloaded but not necessarily viewed. It

11 is a location which a knowledgeable user could access via another program. See

12 *United States v. Kuchinski*, 469 F.3d 853, 862-63 (9th Cir. 2006). Mr. Morse likely

13 had no access to files once in "cache," and it is unlikely that he would know how to

14 get into the portion of the computer storage area.

15    (c) "Recycle" is the deleted file bin. This bin contains files that were not

16 necessarily or even ever likely viewed by Mr. Morse. The total of "recycle" files on

17 all devices is 3,328. The number of "recycle" files on the one active device is 394.

18    Images in "free space," "cache," and "recycle" were thus not in "Active" space,

19 which represents child pornography immediately available and viewable. The total

20 of "active files" on all devices is 1,732. The total of "active files" on the one usable

21 device (Toshiba Laptop 1B17) is 518. These files included some videos, which

22 would move the image count above 600. The child pornography actually seen by Mr.

23 Morse is, therefore, far less than the numbers stated in the PSR.

24    A further issue concerns the claim in the presentence report that Mr. Morse

25 posted images and videos on a P2P website for others to download (resulting in a

26 two-level increase). PSR, p. 8, ¶ 23. As the presentence report indicates, Mr. Morse

27 received the child pornography in this case as a result of his participation in a peer-to-

28 ///

8

1 | peer (P2P) file sharing program, as described briefly in the PSR at p. 4, ¶ 7, footnote
2 | 1.

3 |     P2P permits sharing to occur by installing a P2P program.  Thereafter, Mr.
4 | Morse could download folders which contain images ("files").  No other action is
5 | needed beyond this installation in order for others to have access, or "share," although
6 | a user can also designate files for sharing.  The participation of Mr. Morse in the
7 | sharing aspect was primarily passive.  For his own use, however, Mr. Morse would
8 | generally see a folder or file, and download it based on the name.  Prior to download,
9 | the actual images need not be viewed, nor is there necessarily an indication of the
10 | actual number of images, or types of images, that will be coming in a folder.  For
11 | others to use the program, thereby accessing the files, Mr. Morse did nothing apart
12 | from the installation of the program.

13 |     Because of the characteristics of the P2P program, it is possible for an
14 | individual to obtain thousands or tens of thousands of images in folders which they
15 | never open, never see, and have no knowledge regarding the actual contents.  Single
16 | images and videos can be contained in such folders.  Upon receipt, a folder can be
17 | deleted or recycled, or left untouched. It can, of course, be opened. Once opened, the
18 | files or images within the folder can likewise be left unopened, deleted without
19 | opening, or opened to view a thumbnail or full image.  In the case of Mr. Morse,
20 | Exhibit 1, the government spreadsheet, sets forth what was contained on each device,
21 | and where the files were located.

22 |     **C.**    **Mr. Morse's Conduct After The Warrant**

23 |     As discussed above, after execution of the search warrant, Mr. Morse
24 | immediately notified his supervising partner and the managing partner at his law firm.
25 | The warrant had been executed at his home and no one at work was aware of this
26 | investigation; Mr. Morse could thus easily have simply kept the investigation and
27 | warrant secret, and continued to collect his salary.  He did not do so, and instead
28 | chose voluntarily to disclose the investigation and warrant to his firm.  The regard in

1  which he is held by his supervisors and colleagues is reflected in the letters of the
2  partners of the firm (including a former federal prosecutor, former federal judge, and
3  managing partner among others) attached hereto at Exhibit 4.

4       As also discussed above, Mr. Morse is now receiving counseling and treatment
5  for his addiction and identity issues as a result of his voluntary enrollment in Dr.
6  Wesley Maram's Sex Offender Solution Program. See Exhibit 5. This program is not
7  the simple monitoring program often utilized by Pretrial Services. Rather, beginning
8  on September 10, 2011, Mr. Morse began the evaluation, lab and treatment process
9  in what can be a multi-year program. Id. In addition to making full disclosure to his
10  family, Mr. Morse also continues to voluntarily attend Alcoholics Anonymous at least
11  once a day, actively working with a sponsor.

12

13  **III.   ARGUMENT AND RECOMMENDATIONS**

14      **A.   Corrections To Presentence Report**

15       The advisory guideline calculations of the presentence report concerning the
16  charged offense are correct. Correction to the diary entry references and additional
17  information regarding the state of the seized devices and location of images have
18  been set forth above. The quotes of parents of victims were unknown to counsel prior
19  to reading the PSR. We have no foundation for comment apart from the fact that Mr.
20  Morse never considered any aspect of this suffering during his struggles with
21  addiction.

22      **B.   Guideline And Departures**

23       The guideline calculations set forth in the PSR and Probation Letter to the
24  Court provide an overly simplified and aggressive formula in the determination of
25  what would constitute a reasonable sentence in this case. While the Court will
26  consider the guidelines, we submit that in the arena of child pornography sentencing,
27  they should be accorded less weight than in evaluation of sentencing for other crimes.
28  / / /

10

1   When an advisory guideline lacks empirical data and is driven by congressional

2   directive, it should be accorded less weight, or not followed at all.  See *Kimbrough*

3   *v. United States* 128 S. Ct. 558 (2007), *United States v. Sudyka* 2008 WL 1766765

4   (D.Neb. April 14, 2008).  In *United States v. Beiermann,* 599 F. Supp.2d 1087 (N.D.

5   Iowa 2009), in a child pornography matter, the court found that the guidelines should

6   be rejected on categorical, policy grounds, even in a "mine-run" case, because they

7   were not based on an individualized determination, but yielded an excessive sentence

8   driven by congressional directive.  See also, *Gall v. United States,* 552 U.S. 38 (2007)

9   (considering cases such as drug offenses, also not tied to empirical evidence).

10   Additionally, many of the levels added for specific characteristics appear

11   redundant and unfair, akin to double counting. Addition of two levels for

12   prepubescent minors and two levels for use of a computer fall into this category.

13   Virtually all child pornography possession cases share these characteristics. Further,

14   automatic addition of four levels for sadomasochistic images regardless of the actual

15   number of said images, and irrespective of the fact that only a tiny percentage of these

16   images was found, warrants a downward departure.

17   Mr. Morse committed this crime not for profit, nor for that matter to carry out

18   pedophiliac acts toward children or to act out in any other way.  Mr. Morse's use of

19   the P2P program was intended to be only private and confined solely to his personal

20   life within his apartment. His use of the P2P program resulted in a cascade of folders

21   containing images, only a small percentage of which he viewed.  See Exhibit 1.

22   Where guideline calculations overstate the seriousness of a defendant's conduct, the

23   Court may depart downward (*i.e.,* in fraud cases under U.S.S.G. Section 2B1.1, App.

24   Note 16, or *United States v. McBride,* (362 F.3d 360 (6th Cir. 2004); *United States v.*

25   *Monaco,* 23 F.3d 793 (3d Cir. 1994)).  In the instant case, the high numbers of the

26   guidelines are driven by factors that do not represent the actual number of images

27   seen by Mr. Morse. See *United States v. Sudyka,* 2008 WL 1766765 (D.Neb. Apr. 14,

28   / / /

11

2008) at 5-6. Nor do these guideline numbers reflect his intended passive conduct in downloading a program that would give him access to seeing forbidden images.

For Mr. Morse, the P2P program was a simple and (he thought) isolated way in which to obtain and view child pornography and erotica. It appears, from the vast number of cached, recycled and free (unallocated-unused) images in the folders received by him, that he would download a folder and select a few images out of the folder, thereafter viewing a portion of those. The remainder, it appears thousands, were unseen, unsaved and once sent to recycle or free space, inaccessible by him.

In addition to these departures under the guidelines, the *Booker*, non-guideline considerations should be considered by the Court. We address these next.

### C.   *Booker* Considerations

In *United States v. Booker*, the United States Supreme Court held that the mandatory sentencing guidelines scheme, used by the federal courts for almost 20 years, was unconstitutional. 543 U.S. 220, 125 S.Ct. 738 (2005). Under the remedy portion of the unique two-part *Booker* opinion, the sentencing guidelines are now "advisory," and while sentencing courts must continue to consider the now-advisory guidelines in sentencing, courts must sentence in light of all of the sentencing concerns enumerated in 18 U.S.C. § 3553(a). Thus, the Court held that the sentencing court should "consider guidelines ranges . . . but it permits the court to tailor the sentence in light of other statutory concerns as well." *Id.* at 245. The guidelines are now just one factor of many to consider in fashioning an appropriate sentence that furthers the objectives of 18 U.S.C. § 3553(a). *United States v. Ameline*, 400 F.3d 646, 655-56 (9th Cir. 2005).

Sentencing is to be based on the factors enumerated in 18 U.S.C. § 3553(a), with the overriding concern that "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [sentencing]." 18 U.S.C. § 3553(a). "Accordingly, in addition to the advisory guideline range, a sentencing court must consider 'the nature and circumstances of the offense and the history and

12

1   characteristics of the defendant' as well as the need for the sentence to reflect the
2   seriousness of the offense, promote respect for the law, provide just punishment,
3   afford adequate deterrence, protect the public, and provide the defendant with needed
4   training and medical care.   In addition, the court must consider the relevant
5   Sentencing Commission policy statements and the need to avoid unwarranted
6   sentencing disparities and to provide restitution to victims." *Ameline*, 400 F.3d at
7   656.

8       All of these factors may also be considered by the Court in adjudicating a
9   reasonable sentence, and one consistent with 18 U.S.C. Section 3553 and *United*
10  *States v. Booker*, *supra*.   Under Section 3553(a), the Court should examine the
11  following factors after calculating the advisory guideline sentence.   They are
12  discussed herein individually.

13                    **1.     The Nature and Circumstances of the Offense**

14      Rather than repeat what has already been described, we refer the Court to the
15  discussion above, and ask that the Court agree with us that those facts should mitigate
16  the sentence in this case.

17                    **2.     The Defendant's Characteristics**

18      Here the mitigating facts are compelling.   The information before the Court
19  from the PSR, Mr. Morse's diary excerpts and the detailed picture provided by
20  numerous letters from his colleagues (Exhibit 4), family and many others who know
21  him well provide a compelling picture of mitigating facts.   See Exhibit 6 (letters of
22  family and knowledgeable people):  among others, Dr. Munzing knows Mr. Morse
23  well, and provides a realistic and compelling statement; attorney Elizabeth Haegelin
24  has worked with Mr. Morse, and provides a strong perspective about his commitment
25  to rehabilitation; Matthew Carden, cited briefly in the PSR (at p. 11, ¶ 52); the full
26  letter of Mr. Carden brings a global perspective from a person of similar age.   And
27  of course, the parents and many relatives of Mr. Morse, all now knowledgeable about
28  the facts of this tragic matter, provide a strong sense of the shame that Mr. Morse is

undergoing, and the complete upending of his previously held level of respect. In all, the penalties suffered by Mr. Morse are significantly greater than in the case of an average defendant before this Court. The large contingent expected to attend the sentencing will stand ready to answer any questions regarding character or remorse that may arise.

Mr. Morse's criminal conduct is limited to his involvement with child pornography. The fact that many more images arrived via the program than he may have viewed or even realized, is a product of his lack of knowledge. He has no past history of violations of any sort, and there is no evidence that he ever acted to do anything other than obtain and view child pornography. The shock of colleagues and family attests to the isolated nature of his transgressions.

The words of his colleagues and family members speak loudly in this matter. The disgrace and loss suffered by Mr. Morse is all the greater because of his otherwise law abiding and exceptionally well regarded reputation. We ask the Court to consider the impact of shame and disgrace on a successful, esteemed young person as opposed to an average defendant. The horror of the destruction of one's life in such a circumstance cannot be overstated. This penalizing impact should carry weight in the evaluation of a fair sentence.

Two factors which highlight Mr. Morse's character and good faith struggles in this matter bear repetition: 1) The diary entries chronicle his failed attempts to cope with the addiction. They are the product of a young man of good character who futilely tried to keep his problems to himself, taking out the frustrations with himself by discarding and damaging his computers in an attempt to remove the temptation, all the while trying to maintain the outward semblance of an earnest conservative young associate (and son to his parents) in a very competitive world; 2) When his world collapsed, he immediately came to his firm and confessed. He did this not to save himself, but to act with integrity to protect the firm and client. These acts speak louder than words. Thereafter, he took good faith steps to address the problem after

14

1   his notice of the investigation, volunteering for treatment with a recognized sex
2   offender program (Sex Offender Solutions run by Dr. Maram – See Exhibit 5) and by
3   maintaining sobriety by diligent participation in AA, including work with a sponsor.

4           **3.      Collateral Consequences**

5           The collateral consequences of the conviction and sentence to Mr. Morse are
6   far greater than to the average defendant. He will lose his bar license as a convicted
7   felon, and be unable to practice law. He has already lost his beloved job, as well as
8   a temporary job, and, as confirmed by the difficult time he has had with employment
9   following his discharge from the firm, is unlikely to be employable in the field he
10  trained for and loved. This penalty will follow him for his lifetime. Further, the
11  stigma of a felony conviction will follow him forever, as the status as a registered sex
12  offender. In cases where employment, further education and housing opportunities
13  are going to be denied a defendant, the collateral consequences have been taken into
14  consideration in reducing the sentence. See *United States v. Smith* 683 F.2d 1236,
15  1240 (9th Cir. 1982). Further, the significant restrictions anticipated to be placed on
16  Mr. Morse as a result of his conviction and sentence are substantial and will
17  contribute to his difficulties in finding any form of employment.

18          **4.      Suffering of Mr. Morse – Stigma of Felony Conviction, Sex**
19                  **Offender Registration**

20          Mr. Morse's suffering in this matter, both before and after the execution of the
21  warrant, is unquestioned. The ruin of reputation is a serious issue in this matter.
22  Virtually everyone in his family, social and legal working world, is aware of the
23  felony committed here. Having worked years to gain a reputation through his diligent
24  efforts, he now suffers more greatly because of its loss. Where the consequences of
25  a felony conviction are long lasting and permeate all aspects of a defendant's life,
26  consideration in sentencing is warranted. See *United States v. Libby* sentence
27  c o m m u t a t i o n :    h t t p : / / g e o r g e w b u s h -
28  whitehouse.archives.gov/news/releases/2007/07/20070702-3.html.

15

1          **5.      Acceptance of Responsibility**

2          Mr. Morse is accorded a three-level downward credit for his acceptance of

3   responsibility.  See PSR at p. 3.  Additional downward consideration is warranted

4   when a defendant evidences a super acceptance of responsibility.  Mr. Morse's

5   actions in acceptance of responsibility began immediately following the execution of

6   the warrant.   Consider the choices made by Mr. Morse when he decided to

7   immediately go to the managing partner in his firm and confess in order to protect the

8   firm and clients.  That is an extraordinary sacrifice and shows a state of mind which

9   fully accepts the consequences of his actions.  This state of mind demonstrates that

10  Mr. Morse is willing to admit his crime and enter the correctional system with a frame

11  of mind that affords hope for success in rehabilitation over a shorter time than my

12  otherwise be necessary.  This factor has been recognized as important by courts

13  reviewing sentencing of defendants.  See *Brady v. United States,* 397 U.S. 742, 753,

14  90 S.Ct. 1463, 1471 (1970).  See also, *Smith v. Wainwright*, 664 F.2d 1194, 1196

15  (11th Cir. 1981).

16         Mr. Morse's acceptance of responsibility continued by his actions in seeking

17  voluntary rehabilitation.  His letter to the Court is direct and straightforward.  Exhibit

18  7.

19         **6.      Rehabilitation**

20         Rehabilitation in this matter has already begun, and has been ongoing since

21  September 10, 2011.  See Exhibit 5.  The rehabilitation program involves three phases

22  of treatment:  Phase I is from six to twelve months long; Phase II runs from twelve

23  to eighteen months; and Phase III can run for twelve months. Mr. Morse's efforts in

24  this regard are worthy of greater consideration than in other cases where the

25  defendant has awaited sentencing without such participation.  See *United States v.*

26  *Stern,* 590 F.Supp.2d 945, 954 (N.D. Ohio 2008); *United States v. Cherry* 487 F.3d

27  366 (6th Cir. 2007).  Similarly, downward departure in cases where a defendant has

28  entered a nationally recognized sex offender program and has an excellent long term

1 | prognosis with minimum risk of re-offending is warranted. See also *United States v.*
2 | *Shasky,* 939 F.Supp. 695 (D.Neb 1996).

3 | In addition to considering Mr. Morse's work in rehabilitation, we ask the Court
4 | to consider the eight months he has in the program thus far, when determining a
5 | length of sentence in this matter.  Further, Mr. Morse's work in Sex Offender
6 | Solutions reduces the risk of his becoming a repeat offender.

### 7.  Mr. Morse's Vulnerability in Custody

8 | Mr. Morse is vulnerable to victimization in custody not only as a result of the
9 | charges, but due to his complete inexperience with incarceration as well.  In *United*
10 | *States v. Rausch,* 570 F.Supp.2d 1295 (D.Colo. 2008), a defendant convicted of child
11 | pornography possession was given a reduced sentence due to the unacceptably high
12 | risk of victimization in custody, despite the Bureau of Prisons assurances that it
13 | would do the best possible job in keeping him safe.

### 8.  Avoidance of Disparity in Sentencing

15 | In cases of child pornography possession, consideration in variance or
16 | downward departures in sentencing was given where defendants with  previously
17 | impeccable credentials and excellent standing in the community faced catastrophic
18 | collateral consequences.  We ask that the same consideration of all factors be
19 | accorded in this matter.

20 | In *United States v. Calcagno,* 06-CR-152-AHM, the defendant was a respected
21 | Orange County deputy sheriff sergeant with 21 years on the job.  He actively
22 | possessed over one million images of child pornography.  As a result of his
23 | conviction, he was discharged from the department, and rendered unemployable and
24 | a registered sex offender.  He was sentenced to 42 months in prison.  In *United States*
25 | *v. Kline,* 02-CR-00040-CBM, a respected state court judge, was convicted of multiple
26 | counts of child pornography possession.  He was sentenced to 27 months in prison.
27 | In each case it was recognized that the consequences in addition to the prison
28 | / / /

17

1  sentence, were far greater as a penalty than suffered by other similarly charged
2  persons.

3      A consistent evaluation of the characteristics of this defendant and the
4  circumstances of his offense would render a similar significant consideration.

5          **9.   Deterrence**

6      A heavy sentence is not necessary to deter Mr. Morse. His sustained work with
7  the Sex Offender Solutions demonstrates his commitment to treatment and an attitude
8  of rehabilitation.  When a defendant demonstrates a willingness to involve him or
9  herself in such a voluntary way, this factor is important in sentencing consideration.
10 See *United States v. Stern,* 590 F.Supp.2d 945, 954 (N.D. Ohio, 2008).

11     Further, Mr. Morse himself has demonstrated his unlikelihood of re-offending.
12 Due to the unfortunate involvement of the Court and Pre Trial Services (PTS) during
13 the presentencing phase of this matter, we have insight to support the absence of Mr.
14 Morse's inclination to re-offend.  As the Court will recall, Mr. Morse was brought
15 before this Court for going on a non-workplace computer to fill out an Internet
16 government unemployment application without permission of PTS. His conduct of
17 going online solely to fill out the form, and then doing nothing further, is confirmed
18 by the search of the device shortly after PTS became aware of the transgression.
19 While it would be preferable not to have been before this Court in that instance, the
20 actual conduct of Mr. Morse shows that his was not inclined to seek out forbidden
21 materials.

22     The Sex Offender Solutions program should also receive credit for providing
23 Mr. Morse with the treatment and education to support his avoidance of involvement
24 with pornography.

25     Deterrence of the public in general was also considered by the courts
26 sentencing the two defendants noted above.  In a case where an individual such as
27 Mr. Morse will lose his job, lose his profession, and be subject to community wide
28 disgrace, a sentence of prison of any length will have a deterrent effect.  Any

1   professional holding a license of any kind who sees this case will be deterred.  Where

2   high functioning individuals face catastrophic destruction of their life as they know

3   it, deterrence is effectuated.

4         **10.**    **Educational, Vocational and Treatment Consideration**

5         The rehabilitation program in which Mr. Maram is involved would last

6   approximately three years.  Upon release from prison (should the Court so sentence),

7   an order requiring Mr. Morse to complete the program could be considered as part of

8   the length of his overall sentence.  Were the Court to sentence Mr. Morse to a reduced

9   sentence in prison, followed by completion of the Sex Offender Solution 3 year

10  program, the length of his participation in both prison and the program would be

11  significant.

12      **D.**    **Recommendations**

13        **1.**    **Prison Sentence**

14        A sentence of lengthy house arrest followed by completion of the current

15  program would appear reasonable in this matter.  If the Court is inclined to issue a

16  prison sentence, we recommend no greater than 24 months plus the aforesaid program

17  as the term best satisfying the mandate of Section 3553(a).  We ask the Court to

18  carefully review what may seem "boilerplate" terms of supervised release, and

19  consider the impact of each term on a person such as Mr. Morse.  While undoubtedly

20  part of a necessary sentence, the impact will be enormous, and should be weighed in

21  the determination of a need for the minimum sentence to do the job in this matter.

22        **2.**    **Post-sentencing Rehabilitation**

23        Should the Court issue a prison sentence, we recommend that the order for the

24  Sex Offender Treatment Program set forth in the Probation Letter be included.

25        **3.**    **Supervised Release Consideration**

26        In light of the ever-increasing vigilance of sex offender registration, we

27  recommend a seven-year term of supervised release.  Mr. Morse has shown a great

28  capacity for rehabilitation in this matter.  In addition, his forthright voluntary

19

disclosure of the investigation and his crime to his employer, followed by extensive efforts at rehabilitation, reflect an individual who is not in need of a lifetime supervision.

### 4.   Self-surrender

The purpose of a sentence is better satisfied if Mr. Morse is permitted to continue his rehabilitation work with Sex Offender Solutions and self-surrender at a date in the future.  It is our understanding that the Bureau of Prison designation process is better able to accommodate the purposes of sentencing if they are given time to evaluate the defendant and examine the Court's orders. Also, the designation system apparently places persons who self-surrender in a less serious category than those who are taken into custody upon sentencing.  To this end, an order of self-surrender even for a short time would suffice if the Court so determines that near immediate custody is required.

The current terms of electronic monitoring in place provide adequate assurance that Mr. Morse will continue to abide by all Court orders.

### 5.   Residential Drug Abuse Program (RDAP)

In light of the extensive information regarding alcohol abuse and ongoing treatment in this matter, we ask that Mr. Morse be recommended for the Residential Drug Abuse Program (RDAP) if custody is ordered.

Dated:        April 30, 2012                Respectfully submitted,

PAUL S. MEYER
A PROFESSIONAL CORPORATION


PAUL S. MEYER
Attorney for Defendant
CARLTON NEIL MORSE

DEFENDANT'S SENTENCING MEMORANDUM